### IN THE UNITED STATES DISTRICT COURT
### FOR THE WESTERN DISTRICT OF ARKANSAS

| | |
|---|---|
| **UNITED STATES OF AMERICA,** ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | Case No. **5:17-CR-50018-TLB** |
| ) | |
| **DARRELL ROSEN,** ) | |
| Defendant. ) | |

### SENTENCING MEMORANDUM

COMES NOW the defendant, **Darrell Rosen**, by the Office of the Federal Public Defender and its attorney, **Jack Schisler**, and does hereby respectfully move this Court as to the following: for a downward variance or downward departure from the current advisory guideline range of 63 to 78 months to a sentence of 24 months custody followed by term of supervised release. The suggested sentence is based upon the following:

#### Preliminary Conclusion

Mental illness is not easy to see. Yet, a serious mental illness played a significant role in Mr. Rosen's crime. A law-abiding citizen for most of his life, the effects of untreated Bipolar disorder, as well as upheavals in his personal life, combined to impair his judgment and cloud his reasoning, ultimately sending him down a path toward criminal acts, humiliation, and shame. At age 59, and never before convicted of any crime, a sentence of 24 months in prison will have an enormous impact on him and will address all of the purposes of punishment, while at the same time being no greater than necessary to accomplish those goals.

A 24-month sentence is below the advisory guideline range as it stands as of this writing, or if certain outstanding objections to the guideline calculation are sustained, however such a below-guideline sentence is warranted for a variety of reasons, including the departure bases of diminished capacity and mental or emotional condition, as well as an application of the § 353(a) factors.

## Status of Unresolved Objections to the PSI

There are three unresolved, and guideline-determinative, objections to the PSI. As of this writing, the parties are discussing possible resolutions to some of those objections. In the absence of any pre-hearing resolution, Mr. Rosen incorporates and adopts the arguments set out in <u>Defendant's Response to Presentence Investigation Report</u>, ECF 42, and will supplement those arguments as necessary at the sentencing hearing.

## Law & Analysis

Mr. Rosen had, what many would describe as, the ideal life. Married, with children, success in the workplace, a home, friends and colleagues who trusted and respected him. But things started to go wrong for Mr. Rosen. His long-time marriage ended, his father became seriously ill and began to require more and more of his son's attention and care, and after 27 years with Proctor and Gamble, a corporate reshuffling eased Mr. Rosen into a somewhat early retirement. Accustomed to being productive, proud of his ability to solve problems, and to deal with challenges, these life events, in combination, were beyond him. He could not save his marriage, he could not make his father well, and his longtime career was over. The self-imposed pressure to fix things,

to find the answers, and to continue to lead his family as he had all these years was crushing. But in addition to this mounting stress there was something else, something Mr. Rosen would only come to understand and to come to grips with after it was too late. A course of events was already unfolding, set in motion by Mr. Rosen in order to try and fill the void, to allow him to regain some semblance of control, to restore his problem solving ability, to allow him to succeed in life again. But in doing so, he violated his core principals, and crossed a line he never thought he would ever get near: he broke the law. On January 5, 2018, Mr. Rosen's birthday, in front of family and victims, he admitted to this Court to taking money he promised investors he would put into a business and instead used it for his own purposes. This is not who Mr. Rosen is, this is not what Mr. Rosen believes is right, yet this is what Mr. Rosen did. The question before the Court is to what degree Mr. Rosen should be punished for his conduct, and in order to answer that question, another question must first be answered: *What motivated Mr. Rosen to break the law for the first time in his life?* That he was greedy, and this was simply about money is far too simplistic an answer. Mr. Rosen's history contradicts that explanation, as does his conduct since his plea. While life events had impacted him financially, Mr. Rosen was not destitute. Despite the impact of his guilty plea, he has managed to keep a roof over his head during the period of pretrial release. He accomplished this not through deceit, but through hard work, and humility, doing the best job he could at whatever jobs were available. These are not the characteristics of a person who at his core is a cheat, a huckster, or a criminal. If this was who Mr. Rosen really was, he could not have gone undetected for 50 plus

years, leaving behind no clue as to his true character.  There would be a history of shady deals, bounced checks, unpaid debts, or some other indicator that this person was trouble.  None of this is true of Mr. Rosen.  His offense conduct is aberrant.  It is evident that some outside factor was at work, shaping his decisions, clouding his judgment, and impairing his ability to do the right thing.   The unseen force that, to a significant extent, influenced Mr. Rosen's actions is Bipolar disorder, a serious mental illness that doctors on both sides of this case agree afflicts Mr. Rosen.[1]  This disorder, or something akin to it, has appeared over the years in several of Mr. Rosen's family members, most notably his mother.  This condition, while not excusing Mr. Rosen's conduct, offers a reasonable explanation for behavior so outside the norm for him.

Once known as manic depression, those who suffer from Bipolar disorder cycle between periods of intense hopelessness and periods of equally intense mania. During the former, the sufferer feels that nothing is going to work out, and that life is bad, and things will get worse.  But when mania takes hold, life is beautiful, the sky is the limit, and nothing is out of reach.  Goals or objectives that a reasonable person would see are unreasonable, imprudent, impossible, or even criminal, are seen by those in the manic phase of Bipolar disorder as not only possible, but as highly likely, or even as sure things.  In fact, the outcome of an enterprise appears so certain to be positive for everyone involved, that often, the ends justify the means.  In his manic state, Mr. Rosen knew his dog business was going to work, and that, as promised, everyone—the

---

1 Dr. Fallis and Dr. Mark Priest, Mr. Rosen's treating psychologist, have diagnosed Mr. Rosen with Bipolar I disorder, a more severe form of the condition than Bipolar II disorder, the diagnosis offered by Dr. Samuel Browning, who examined Mr. Rosen in the Bureau of Prisons.

investors and himself—was going to make a lot of money.   But in reality, the likelihood of success was far from certain.   As the mania passed, Mr. Rosen realized he could not do what he promised, could not create that return on investment, but rather than facing the situation rationally, as a person of sound mental health would do, he cycled into a depressed state, into what amounted to hopelessness.   This cycling, the hallmark of Bipolar disorder, hampered Mr. Rosen's ability to make good decisions, and in fact, led to the opposite, terrible decisions that only worsened his situation.         Through discussions with doctors, and with the aid of medication, Mr. Rosen is in remission, and can see how much damage he has done to himself and to others, and he is ashamed. He could see his conduct was wrong during the course of the instant offense, but not as clearly as he sees it now.   Forensic psychologist Dr. Emily Fallis assessed Mr. Rosen, examined his mental health history, and determined Bipolar disorder impaired his reasoning ability:

> During these alternating mood states, he was overwhelmed with stressors and had substantially impaired capacity to focus on or realistically assess appropriate, responsible behavior.

Dr. Fallis report, p. 8.[2]

Dr. Fallis is expected to be called as a witness during the sentencing hearing to more thoroughly discuss her findings, but in sum, believes his untreated mental illness diminished his capacity to conform his conduct to the requirements of the law, and should be treated as mitigating his conduct.

---

2 Counsel for the United States has a copy of this report, and counsel for Mr. Rosen will make a copy available to the Court, for attachment to the final Presentence Investigation Report, prior to sentencing.

*Basis for Downward Departure and Downward Variance*

Mr. Rosen seeks a downward departure from the otherwise applicable advisory guideline range based upon U.S.S.G. § 5H1.3 Mental and Emotional Conditions, and U.S.S.G. § 5K2.13 Diminished Capacity.

U.S.S.G. § 5H1.3 Mental and Emotional Conditions reads in pertinent part:

> Mental and emotional conditions may be relevant in determining whether a departure is warranted, if such conditions, individually or in combination with other offender characteristics, are present to an unusual degree and distinguish the case from the typical cases covered by the guidelines. *See also* Chapter Five, Part K, Subpart 2 (Other Grounds for Departure).

Bipolar disorder is a serious mental illness, and while the doctors involved in the case disagree as to the diagnosis of Bipolar I or Bipolar II, all agree that mental illness is an aspect of this case. It is clear that Mr. Rosen's condition is "present to an unusual degree" as at least one medical professional has opined it influenced his behavior in connection with the offense. Mr. Rosen's mental disorder, combined with his decades-long history of otherwise law-abiding conduct, makes this case atypical, and warrants a downward departure from the advisory range.

U.S.S.G. § 5K2.13 Diminished Capacity reads in pertinent part:

> A downward departure may be warranted if (1) the defendant committed the offense while suffering from a significantly reduced mental capacity; and (2) the significantly reduced mental capacity contributed substantially

> to the commission of the offense. Similarly, if a departure is warranted under this policy statement, the extent of the departure should reflect the extent to which the reduced mental capacity contributed to the commission of the offense.
> However, the court may not depart below the applicable guideline range if (1) the significantly reduced mental capacity was caused by the voluntary use of drugs or other intoxicants; (2) the facts and circumstances of the defendant's offense indicate a need to protect the public because the offense involved actual violence or a serious threat of violence; (3) the defendant's criminal history indicates a need to incarcerate the defendant to protect the public; or (4) the defendant has been convicted of an offense under chapter 71, 109A, 110, or 117, of title 18, United States Code.

As with § 5H1.3, the facts and circumstances of this case warrant a departure under § 5K2.13. The prohibitions listed in the section, voluntary intoxication, violence, criminal history, and convictions for certain enumerated offenses, do not apply. The evidence shows mental illness was at play, significantly reducing Mr. Rosen's mental capacity, and significantly contributing to the commission of the offense.

The Eighth Circuit, in *United States. v. Mark*, 425 F.3d 505 (8th Cir. 2005) recognized this basis for departure, but denied the defendant's request for a departure, in part, because his offense was among the offenses prohibited in the section itself. The Court noted how the comments to the section define "significantly reduced mental capacity":

> The Sentencing Commission has defined "significantly reduced mental capacity" to mean that "the defendant, although convicted, has a significantly impaired ability to (A) understand the wrongfulness of the behavior comprising the offense or to exercise the power of reason; or (B) control behavior that the defendant knows is wrongful."

*Mark*, 425 F.3d at 506–07 (8th Cir. 2005).

It is also important to distinguish that the facts that could warrant a departure under this

rationale do not have to rise to the level of a defense to the instant offense, and that they can be viewed in conjunction with other facts.

> The diminished capacity of the defendant need not be the only factor which causes the commission of the crime in order for the court to depart downward under this section of the Guidelines. *United States v. Ruklick,* 919 F.2d 95, 97 (8th Cir.1990) (remanding case for reconsideration after conviction for distribution of LSD, holding that the mental illness need not be the "but-for" cause of the offense).

*United States. v. McMurray*, 833 F. Supp. 1454, 1480 (D. Neb. 1993).

Although this is a recognized basis for departure, there is a risk that consideration of whether a below-guidelines sentence is warranted in this case could be impacted by the stigma that surrounds mental illness, the many unanswered questions as to its origins, its varying effects on individuals, and the simple fact that it is not readily visible to the naked eye. These unknowables tend to make simpler, easier, seemingly obvious explanations for behavior more palatable. But where mental illness is involved, nothing is obvious, nothing is simple, and nothing is easy. While it would be easy to agree with the government's argument that this was all about greed, that answer completely, and improperly, ignores what amounts to a medical condition not unlike cancer, or a broken bone, that clearly impacts a person's functioning. The difference lies in the fact that cancer can be seen with a CAT scan or an MRI. A broken bone can be detected by an x-ray, or observed by the deformation of a limb, or by the bone protruding through the skin. Mental illness is not easy to see. At present, it can only be detected by testing, and by evaluation of the behavior of those afflicted. But this does not mean mental illness is any less real, or any less a disease, than

leukemia or Parkinson's.  In its various forms, it can even cause a seemingly normal person to take his or her own life--in some peoples' view--the ultimate crime.  It is not unreasonable then to conclude that Mr. Rosen's mental illness contributed to, exacerbated, or influenced his behavior.  In the instant case, what might appear to be the simple answer is the wrong answer.  This is not just about money, it is about having something fundamentally wrong with the way a person thinks.  How one thinks controls how one behaves.  If your thinking is wrong, your behavior will be wrong, and if you cannot completely control how you think, you cannot completely control your behavior.  Mr. Rosen was not able to completely control his behavior.  These facts warrant a downward variance.

     A 24-month custody term, under the facts of Mr. Rosen's case, would comport with the requirements of 18 U.S.C. § 3553(a).  The offense is clearly serious, involves several victims and a substantial loss figure, but it is a non-violent offense, committed by a man with no prior contact with the law, and with significant mental health issues.  Mr. Rosen is college-educated, and at 59 years old, his history and characteristics speak to a defendant whose risk of recidivism is extremely low.  24 months in custody, while less than the advisory range, is not a short period of time, and, because of Mr. Rosen's lack of criminal history, and because his only previous experience with prison is this case, the impact of that sentence is likely to be felt more keenly by him than by someone who is accustomed to being in and out of jail.  See *United States v. Baker*, 445 F.3d 987, 990 (7th Cir. 2006) (Appeals court upheld district judge's rationale for a below-guidelines sentence where the sentencing judge stated " . . . a term of

imprisonment would probably mean more to him and have a greater impact than on someone who had previous experience being incarcerated[.]").   Mr. Rosen spent six weeks in the custody of the Bureau of Prisons during his psychological study, and understands any future incarceration would likely not be in the relative calm of a federal medical center, but in a regular federal prison facility.   He is anxious about his future, but is resigned to the fact that he must pay for his offense, and he is steeling himself for his new life in prison.   Such a prison sentence would provide deterrence, promote respect for the law, and, under these circumstances, would not be an unwarranted sentencing disparity.   Mr. Rosen's conduct is out of character for him.   This is demonstrable by the way he led his life prior to this offense, and how he has led it since this case began.   The parsimony principle would be well served by a 24-month sentence, as would the 3553(a) factor addressing the " …need to provide restitution to any victims of the offense."   18 U.S.C. § 3553(a)(7).   It is likely the victims do not believe, or expect, they will be fully repaid, but Mr. Rosen is committed to making restitution as best he can.   Unlike many defendants, he has the ability to earn, and could make significant strides toward repayment, but would fare better in that regard upon release than while he is working in the BOP for insignificant wages.   Certainly, the proof of his commitment to make things right with the people whose trust he betrayed will be in what he actually does, but a legitimate purpose is served by allowing him to begin that effort sooner rather than later.

## Conclusion

This is Mr. Rosen's situation and few would want to change places with him, but

even in the face of the penalties in store for him, he is not asking this Court to excuse his behavior. He knows to ask that would be unreasonable; instead, he is simply asking that the totality of his actions be taken into account, that the good things he has done in his life be measured against the bad, and that this measuring be done with the idea that his failings were not totally of his own making.

WHEREFORE, the defendant, Darrell Rosen, respectfully requests this Court to impose a sentence of 24 months custody, to be followed by a term of supervised release with a condition calling for mental health testing and treatment.

Respectfully submitted,

BRUCE D. EDDY
FEDERAL PUBLIC DEFENDER
WESTERN DISTRICT OF ARKANSAS

By:   /s/ *Jack Schisler*
Jack Schisler
Assistant Federal Public Defender
3739 N. Steele Blvd., Ste. 280
Fayetteville, AR 72701
(479) 442-2306

Counsel for Defendant

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of the Court using the CM/ECF System which will send notification of such filing registered CM/ECF participants.

/s/ *Jack Schisler*
Jack Schisler
Assistant Federal Public Defender

S:\Rosen_Darrell_2017_122\Sentencing Memo Rosen, Darrell.docx